*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CHRISTOPHER MICHAEL CHARBONEAU,

Defendant-Appellant.

UNPUBLISHED
August 21, 2025
12:54 PM

No. 368258
Wayne Circuit Court
LC No. 21-000262-01-FC

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b)(*i*) (sexual penetration with victim under the age of 16 and in the same household), and two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(b)(*i*) (sexual contact with victim under the age of 16 and in the same household). He was sentenced to 15 to 40 years' imprisonment for each CSC-I conviction and 5 to 15 years for each CSC-II conviction. Defendant appeals as of right and we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant was convicted of sexually assaulting the victim, his stepdaughter, when she was between the ages of 9 and 15. Defendant first met the victim when she was approximately six years old, and her mother moved into defendant's house after the two started dating. Defendant and the victim's mother eventually married, and the family settled in a house in Westland when the victim was approximately nine years old. Defendant's son, LC, from a prior relationship, visited the family on weekends.

The victim testified that defendant sexually assaulted her at this Westland home and at different camping sites across the state. Additionally, FW and AM, the victim's two friends who spent the night at the Westland home, testified that they were also sexually assaulted by defendant while playing games at the house. LC also testified for the prosecution. Specifically, during a camping trip, defendant shared a tent with the victim while LC slept in a hammock. LC could hear movement in the tent occupied by defendant and the victim. Later, LC observed defendant lying next to the victim who was topless.

-1-

At trial, the victim testified that she did not have a father figure in her life and that she loved defendant. As she aged, the victim realized that defendant's actions with her were inappropriate and criminal. The victim disclosed the sexual abuse to her then-boyfriend and his mother when she was 15 years old. They took her to the police. The victim also acknowledged that she had previously denied any sexual conduct with defendant when AM raised accusations against him. Nonetheless, at trial, the victim testified that the sexual abuse repeatedly occurred and that she had no ulterior motive to fabricate her claims.

But defendant and his wife, the victim's mother, testified that the victim began to sneak out of the house to meet with her then-boyfriend and had other behavioral issues. Defendant contended that the victim raised these allegations against him after she was disciplined. Defendant further testified on his own behalf and denied any improper conduct with any of the girls.

Ultimately, defendant was convicted and sentenced as noted. After defendant initiated his appeal, he sought to have the case remanded for a *Ginther*[1] hearing to address his claims of ineffective assistance of counsel. This Court denied that motion.[2]

## II. LOSS OF EVIDENCE

Defendant first contends that he is entitled to have the charges against him dismissed because exculpatory evidence that was in the prosecution's possession was destroyed. The evidence in question, data from the victim's cellular telephone, was erased when a forensic analyst with the Michigan State Police was attempting to extract the data. According to defendant, under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), the evidence lost from the cellular telephone was favorable to defendant, and therefore exculpatory, because it would have been used to impeach the victim. We disagree.

The Court reviews de novo due-process claims. *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016). "A criminal defendant has a due process right to obtain exculpatory evidence possessed by the prosecutor if it would raise a reasonable doubt about the defendant's guilt." *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005). In order to establish a *Brady* violation, the defendant must prove: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Dimambro*, 318 Mich App at 212 (quotation marks and citations omitted).

In the trial court, the prosecutor disagreed with the assertion that *Brady* was the appropriate standard when evidence was inadvertently destroyed; instead, the prosecutor asserted that *Arizona v Youngblood*, 488 US 51; 109 S Ct 333; 102 L Ed 2d 281 (1988), provided the appropriate

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] *People v Charboneau*, unpublished order of the Court of Appeals, entered July 2, 2024 (Docket No. 368258).

standard. A claim under *Youngblood* involves the "failure to preserve evidence." *People v Dickinson*, 321 Mich App 1, 16; 909 NW2d 24 (2017). "To warrant reversal on a claimed due-process violation involving the failure to preserve evidence, a defendant must prove that the missing evidence was exculpatory or that law enforcement personnel acted in bad faith." *Id*. (quotation marks and citation omitted). See also *People v Heft*, 299 Mich App 69, 79; 829 NW2d 266 (2012) ("If the defendant cannot show bad faith or that the evidence was potentially exculpatory, the state's failure to preserve evidence does not deny the defendant due process."). "The defendant must show that the evidence might have exonerated him or her." *Id*. at 79. It is the defendant that bears the burden to show the failure to preserve was in bad faith. *Dickinson*, 321 Mich App at 16. The trial court agreed with the prosecutor that the issue was whether the prosecutor failed to preserve evidence and not whether the prosecutor suppressed evidence. Thereafter, the court concluded that defendant had not established that the evidence was lost in bad faith.

We agree that the appropriate standard is that under *Youngblood*. Accordingly, for defendant to prevail on his claim, he is required to show that (1) the evidence was exculpatory, or (2) it was lost in bad faith. *Id*. Defendant has not established either alternative. Addressing bad faith, defendant did not provide the trial court or this Court with any direct evidence that the forensic analyst intentionally erased the victim's data on her cellular telephone. At trial, the analyst testified that she was attempting to recover the data and held the volume buttons for too long, which was a mistake and caused the telephone to perform a factory reset. According to defendant's expert, Larry Dalman, this process was not required because the analyst was using, GreyKey, that did not require the analyst to press any keys to download the data. But Dalman later admitted that his testimony was speculative given that he had never used GreyKey because it was unavailable to individuals not in law enforcement. Thus, defendant has failed to carry his burden of showing that the forensic analyst intentionally erased the data from the victim's cellular telephone and the trial court did not err when it found there was no bad faith.

In addition, defendant has failed to demonstrate the evidence was exculpatory. *Id*. On appeal, defendant asserts, without citation to any record evidence, that "there were text messages that were favorable, and . . . there was video from the bar that would have been useful to impeach [the victim]." This Court is unable to discern from this conclusory statement what evidence defendant is referring to or why it would be potentially exculpatory. See *People v Henry*, 315 Mich App 130, 148; 889 NW2d 1 (2016) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.") (quotation marks and citation omitted). Accordingly, this argument is abandoned. *Id*.

In the trial court, defendant argued that the lack of data on the cellular telephone was exculpatory, but such an argument was speculative because the claimed lack of data would only be "potentially useful." See *Dickinson*, 321 Mich App at 16. In other words, defendant claimed in the trial court that—assuming it was true—the fact that the victim did not have any text messages referring to defendant's sexual assaults would show that defendant did not, in fact, sexually assault her. But there was no testimony from the victim or anyone else that the victim would have made

such a record in her cellular telephone if defendant was, in fact, sexually assaulting her.[3] Accordingly, the purported lack of evidence on the cellular telephone would, at best, be only "potentially exculpatory," depending on how the victim testified and how the jury viewed the evidence. See *id.* at 17. As a result, defendant has not shown that his right to due process was violated when the trial court denied his motion to dismiss.

## III. OTHER-ACTS EVIDENCE

Next, defendant argues that his right to due process was violated when the trial court permitted the prosecutor to introduce the testimony of the victim's friends, who also alleged that defendant sexually assaulted them. According to defendant, the testimony should have been excluded under MRE 403. Defendant also contends that the statute permitting the victim's friends to testify, MCL 768.27a, deprived defendant of due process because it allowed prejudicial testimony to be introduced. We disagree.

The only claim preserved below was defendant's MRE 403 challenge. For preserved issues, the trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *People v Hill*, 335 Mich App 1, 5; 966 NW2d 156 (2020). "Generally, an appellate court defers to the trial court's judgment, and if the trial court's decision falls within the range of principled outcomes, it has not abused its discretion." *People v Cross*, 281 Mich App 737, 739; 760 NW2d 314 (2008).

"The Legislature enacted MCL 768.27a to address a substantive concern about the protection of children and the prosecution of persons who perpetrate certain enumerated crimes against children and are more likely than others to reoffend." *People v Muniz*, 343 Mich App 437, 457; 997 NW2d 325 (2022) (quotation marks and citation omitted). Under MCL 768.27a(1):

> [I]n a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant.

Historically, courts have recognized that "a defendant's character and propensity to commit the charged offense is highly relevant because an individual with a substantial criminal history is more likely to have committed a crime than is an individual free of past criminal activity." *People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012) (quotation marks and citation omitted).

MCL 768.27a is a statute that directly conflicts with MRE 404(b), "because MRE 404(b) prohibits the admission of a defendant's other bad acts as character evidence to prove the defendant's mere propensity to commit the charged crime." *Muniz*, 343 Mich App at 460. In contrast, MCL 768.27a explicitly permits the introduction of other-acts evidence for the purpose

---

[3] During trial, the victim's journal was admitted into evidence. The victim did not wish to read its contents, acknowledging that she wrote of difficulties and insecurities that she was experiencing because of school. The victim explained that she did not write about the sexual abuse in the journal because her parents would find it.

of showing the defendant's character or propensity to commit similar crimes. *People v Hoskins*, 342 Mich App 194, 201-202; 993 NW2d 48 (2022). "However, because MCL 768.27a is a legislated rule of evidence based on public policy, rather than a purely procedural rule, it is an exception to, and to that extent supersedes, MRE 404(b)." *Muniz*, 343 Mich App at 460. Regardless of whether evidence is admissible under MCL 768.27a, the evidence is still subject to analysis under MRE 403. *People v Beck*, 510 Mich 1, 20; 987 NW2d 1 (2022) ("[E]ven if the evidence is admissible under MCL 768.27a, it must still comply with MRE 403."). Under MRE 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[4]

"Unfair prejudice occurs when there exists a danger that marginally probative evidence will be given undue or preemptive weight." *Beck*, 510 Mich at 20 (quotation marks and citations omitted). When other-acts evidence is admissible under MCL 768.27a, the trial court may consider several factors to determine whether it should be excluded under MRE 403, including:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Watkins*, 491 Mich at 487.]

"This list of considerations is meant to be illustrative rather than exhaustive." *Id*. at 488.

According to defendant, he was convicted on the basis that the jury was outraged and shocked by the testimony of the victim's friends, which should have been excluded under MRE 403. But rather than addressing the *Watkins* factors and elaborating how the trial court erred, defendant contends that the trial court failed "to engage in a proper balancing test under MRE 403 and to properly consider the *Watkins* factors." "As we have repeatedly stated, an appellant may not simply announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Bowling*, 299 Mich App 552, 559-560; 830 NW2d 800 (2013) (quotation marks and citation omitted). Regardless, defendant adds that the trial "court made a conclusory holding that the evidence was more probative than prejudicial and found that the MCL 768.27a permitted the type of other-acts evidence presented."

During the hearing on the admission of the other-acts evidence, however, the trial court ruled that the probative value of the other-acts evidence was not substantially outweighed by its prejudicial effect. But the trial court also explained that the critical issue in this case was whether

---

[4] The Michigan Supreme Court revised the Michigan Rules of Evidence, effective January 1, 2024. See 512 Mich lxiii (2023). We will cite the version of the rules in effect at the time of defendant's trial throughout this opinion.

the events recounted occurred, and, in its view, the allegations concerning what happened during "a game and that there was some kind of fondling" were "very important" to show what allegedly occurred "was not a mistake." Moreover, the court noted that the other-acts established defendant's manner of preying on young girls.

Thus, although the trial court did not explicitly consider each *Watkins* factor, it was not required to do so. And, it plainly concluded that the other-acts evidence was probative and that its probative value was not substantially outweighed by its prejudicial impact.

In any event, review of the *Watkins* factors shows that the trial court did not abuse its discretion. The first consideration is the similarity or dissimilarity between the charged crimes and the challenged testimony. *Id*. The description of defendant's assaults upon all three girls was consistent and does not weigh in favor of exclusion under MRE 403. The victim testified that defendant sexually assaulted her on a number of occasions and described the circumstances surrounding those assaults. In many of them, she described how defendant would grope her while she was clothed and apply pressure with his fingers and penis on her clothed genitals. The testimony from the victim's friends was similar. AM testified that defendant entered the room where she was hiding while they were playing hide-and-seek and groped her clothed breasts. She also testified that defendant tried to digitally penetrate her while she was clothed. These descriptions of the assault were consistent with the victim's descriptions of how defendant had assaulted her. Similarly, FW testified that defendant played the "spin the bottle" game with the children and asked her to take her clothes off. Both the victim and defendant's son, LC, testified similarly. FW also stated that she was in the victim's room at night when defendant entered partially nude and masturbated in the room. This testimony was consistent with the victim's testimony that she had, on at least one occasion, entered the living room to see defendant masturbating on the couch.

The next consideration is the temporal proximity between the charged conduct and the challenged testimony. *Id*. Although the victim testified consistently that the assaults she experienced occurred when she was between the ages of 9 and 15, she had trouble recalling exactly when certain events occurred. Similarly, neither of the victim's friends were able to recall with any particularity when exactly the assaults on them occurred. Even so, the victim knew FW and AM while in middle school. This factor, therefore, favored admission of the evidence notwithstanding MRE 403.

The next factor to be considered is "the infrequency of the other acts" and "the presence of intervening acts," if any. *Id*. While the victim testified that she was assaulted over many years, both friends testified that their assaults only occurred on limited occasions. The victim and AM essentially ended their friendship over a videogame, but the victim testified that defendant played a role in the termination by authoring the messages that were sent. Additionally, FW testified that she deliberately treated the victim poorly in order to avoid spending time at defendant's home. Therefore, this factor is likely neutral or it favored exclusion under MRE 403.

The remaining *Watkins* factors are "the lack of reliability of the evidence supporting the occurrence of the other acts" and "the lack of need for evidence beyond the complainant's and the defendant's testimony." *Watkins*, 491 Mich at 487-488. Both friends were able to describe the assaults committed on them in detail, recounting both the circumstances and environment they

were in as well as defendant's actions and words during the assaults. AM and FW both testified that defendant engaged in game playing before committing the sexual assaults. Their testimony was strikingly similar to the victim's despite denying any discussion amongst them about the abuse. Thus, concerning reliability, the testimony should not have been excluded under MRE 403. Similarly, there was a need for the testimony in the prosecutor's case-in-chief because, as there was a lack of physical evidence to prove the assaults, defendant's convictions rested entirely on the testimony and credibility of the victim. This factor also favored admission of the evidence and appeared to be one of the articulated reasons for concluding that the evidence was not substantially more prejudicial than probative.

Accordingly, defendant has not shown that the trial court abused its discretion by allowing the prosecutor to admit the testimony of the victim's friends. While the testimony was undoubtedly prejudicial, it was not outside of the range of reasonable outcomes for the trial court to determine that the probative value of the other-acts testimony was not substantially outweighed by the danger of unfair prejudice.

Defendant also contends that the application of MCL 768.27a deprived him of due process. Preserved constitutional questions, such as whether defendant was deprived due process, are reviewed de novo. See *People v Stovall*, 510 Mich 301, 312; 987 NW2d 85 (2022). On the other hand, unpreserved constitutional issues are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. Defendant's constitutional argument is unpreserved because defendant did not raise it below. See *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) ("To preserve for review by this Court a constitutional-error claim that implicates a defendant's due-process rights, the issue must be raised in the trial court.").

Defendant argues that MCL 768.27a violates due process because it undermines the fundamental fairness of criminal trials by allowing the prosecution to present evidence to prove an improper character-to-conduct inference, contravening longstanding rules to the contrary. The United States Supreme Court has held that states have "broad latitude under the Constitution to establish" rules governing the introduction of evidence. *United States v Scheffer*, 523 US 303, 308; 118 S Ct 1261; 140 L Ed 2d 413 (1988). A rule must be a matter of "fundamental fairness" before it may be of constitutional magnitude. *Dowling v United States*, 493 US 342, 352; 110 S Ct 668; 107 L Ed 2d 708 (1990). Federal courts have held that an analogous rule under federal law, FRE 414, does not violate due process. See *United States v LeMay*, 260 F3d 1018, 1027 (CA 9, 2001); *United States v Castillo*, 140 F3d 874, 879-883 (CA 10, 1998). Those courts have explained that there is no constitutional right to the exclusion of propensity evidence and that, so long as the courts remain able to exclude otherwise admissible propensity evidence under FRE 403, the rule allowing the admission of propensity evidence does not violate due process. *LeMay*, 260 F3d at 1027; *Castillo*, 140 F3d at 879-883. This Court has also concluded that applying MCL 768.27a does not violate due process, *Muniz*, 343 Mich App at 460-461, and determined that a defendant's due process challenge to the admission of other-acts evidence that is subject to MRE 403's balancing test is moot, *People v Gaines*, 306 Mich App 289, 303 n 9; 856 NW2d 222 (2014), citing *Watkins*, 491 Mich at 456 n 2. For these reasons, we reject defendant's

argument that MCL 768.27a deprived him of due process. Because defendant has failed to establish any error, let alone plain error, he is not entitled to relief.

## IV. PROSECUTORIAL MISCONDUCT[5]

Defendant also argues on appeal that the trial court plainly erred when it permitted the prosecutor to elicit from Sergeant Nathan MacRae, the officer in charge of the case, that defendant was "evasive" during his police interview. According to defendant, this exchange deprived him of a fair trial because it permitted Sergeant MacRae to opine on defendant's credibility, which is impermissible. We disagree.

"To preserve a claim of prosecutorial misconduct, the defendant must make a timely and specific objection to the conduct at trial." *People v Clark*, 330 Mich App 392, 433; 948 NW2d 604 (2019). Defendant did not object to the prosecutor's question or Sergeant MacRae's response and has, therefore, failed to preserve this issue for appeal. See *id*. Unpreserved issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

"A witness may not comment on, or vouch for, the credibility of another witness." *People v Lowrey*, 342 Mich App 99, 109; 993 NW2d 62 (2022). Additionally, "[a] witness may not opine about the defendant's guilt or innocence in a criminal case." *Id*. (quotation marks and citation omitted). When a witness vouches for the credibility of another witness, it invades the province of the jury to decide the issues before it. *Id*. "Nevertheless, a police officer may testify about his or her perceptions during the course of an investigation of whether a defendant was being truthful." *Id*.

The day after defendant was arrested, Sergeant MacRae interviewed him. According to Sergeant MacRae, he read defendant his *Miranda*[6] rights, which defendant appeared to understand. During Sergeant MacRae's testimony concerning his interview with defendant, the following colloquy occurred with the prosecutor:

> *Q*. Was he answering your questions directly?

---

[5] The phrase "prosecutorial misconduct" has become a term of art in criminal appeals. *People v Cooper*, 309 Mich App 74, 87; 867 NW2d 452 (2015). But, the term "misconduct" is more appropriately reserved for extreme and generally rare instances when a prosecutor's conduct is illegal or violates the rules of professional conduct. *Id*. at 87-88. Regardless of the terminology employed, we examine whether the prosecutor committed errors that deprived defendant of a fair and impartial trial. *Id*. at 88.

[6] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

*A*. He didn't make any admissions of guilt that I can remember.

*Q*. And when you would ask him questions, was he answering directly, evasive, something different?

*A*. *I perceived his responses to be evasive*, yes. [Emphasis added.]

In *Lowrey*, *id*. at 110, this Court addressed the defendant's argument that the prosecutor committed misconduct when the detective was allowed to give opinion testimony about whether the defendant was being truthful during his interrogation. At the defendant's trial, the detective stated that he did not believe the defendant "was being a hundred percent truthful with me . . . ." *Id*. at 105. On appeal, this Court concluded that while the detective strayed close to the bounds of offering improper testimony, none of the testimony was so objectionable that it was outcome-determinative. *Id*. at 113-114.

This Court began by noting that, in general, "it is not entirely forbidden for a police officer to express the belief that a statement made by a defendant during the course of an investigation was untrue." *Id*. at 112. Thus, the Court stated it was "permissible for an interviewing officer to recount what he or she told an interviewee, including a statement of disbelief." *Id*. at 113. The detective "was clearly permitted to describe the steps he took in his investigation, as well as at least some of his thought processes and the bare fact that he *told* defendant that he did not believe defendant." *Id*. at 114-115. Moreover, any error in admitting the testimony from the detective was not outcome-determinative because the "defendant's own admissions, along with the other evidence admitted at trial, [were] sufficient to establish that the errors in [the d]etective's testimony were not, in this particular case, outcome-determinative." *Id*. at 115.

In this case, defendant takes issue with the prosecutor's question, and Sergeant MacRae's response, about defendant being evasive during the interview. It is clear that the question by the prosecutor regarding whether defendant was being evasive was not in relation to any particular question that Sergeant MacRae posed to him, such as whether he committed the offenses, but rather was Sergeant MacRae's remark on defendant's general demeanor. The prosecutor did not elicit, and Sergeant MacRae did not testify, that defendant was being untruthful about his culpability in committing the crimes. Indeed, Sergeant MacRae never opined as to whether defendant was guilty or not. See *id*. at 114 (stating that the detective "did not express the belief that defendant committed CSC-III, or, for that matter, any particular acts"). Because Sergeant MacRae was entitled to comment on his personal perception of whether defendant was being evasive during the interview provided Sergeant MacRae did not comment on his view of defendant's guilt, see *id*., the trial court did not plainly err when it failed to interrupt the questioning sua sponte and strike the testimony.

Moreover, because defendant did not preserve this argument for appeal, he must demonstrate that absent the error, the outcome of the trial would have been different. *Carines*, 460 Mich at 763. Here, defendant failed to demonstrate that the outcome of this trial would have been different if Sergeant MacRae had not referred to him as being evasive. The jury heard almost three days of testimony from the victim and her friends regarding the specific ways in which defendant groomed and sexually assaulted them. This testimony was corroborated by third parties, including defendant's son, LC, who confirmed that defendant played the spin the bottle game with the

children, and also confirmed several aspects of the victim's accounts of her assaults. Thus, we are unconvinced that the outcome would have been different if Sergeant MacRae had not testified about defendant's evasiveness. Accordingly, the trial court did not plainly err when it permitted and failed to sua sponte strike the exchange.

## V. HEARSAY

Next, defendant contends that the trial court plainly erred when it permitted a sexual assault nurse examiner (SANE) to testify about what the victim told her during her sexual assault exam, including that defendant sexually assaulted the victim. We disagree.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Defendant did not object to the SANE's testimony during trial and has, therefore, failed to preserve this issue for appeal. See *id*. As noted, unpreserved issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763.

Hearsay "is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Under MRE 802, "[h]earsay is not admissible unless these rules provide otherwise." The trial court seemingly admitted the SANE's report into evidence under MRE 803(4).

"In order to be admitted under MRE 803(4), a statement must be made for purposes of medical treatment or diagnosis in connection with treatment, and must describe medical history, past or present symptoms, pain or sensations, or the inception or general character of the cause or external source of the injury." *People v Meeboer (After Remand)*, 439 Mich 310, 322; 484 NW2d 621 (1992). "Statements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care." *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011). Although, for adults, the identification of the perpetrator is not necessarily admissible under MRE 803(4), see *People v LaLone*, 432 Mich 103, 110; 437 NW2d 611 (1989), such statements made by children are admissible because identification of the perpetrator is relevant to ensuring the child's safety, see *Meeboer*, 439 Mich at 329-330.

Defendant contends that the victim's statement to the SANE was not admissible under MRE 803(4) because the victim made the statements at the direction of Sergeant MacRae, who sent her to be examined, rather than on her own initiative. Thus, defendant argues that the purpose of the victim's examination was not for medical treatment but rather to gather evidence to convict defendant. In *People v Duenaz*, 306 Mich App 85, 94; 854 NW2d 531 (2014), this Court addressed a similar argument that the eight-year-old victim's statements to the physician were not admissible under MRE 803(4) because "the statements were not necessary to medical diagnosis or treatment . . . ." In that case, "[t]he victim made statements implicating defendant in the offenses while [the physician] questioned her regarding her history." *Duenaz*, 306 Mich App at 94.

This Court rejected the argument, concluding that "statements of identification in child sexual abuse cases serve several important purposes." *Id*. at 96. This Court explained:

> The doctor can assess and treat any pregnancy or sexually transmitted disease, make referrals for other treatment, including counseling, and structure the examination to the exact type of trauma the child recently experienced. The doctor can also assess whether the child will be returning to an abusive home. In this case, the attacker's identity was important because he was a family friend who managed to take the child with him more than once. Generally, identification of the assailant can be as important to the health of the child as treatment of the physical injuries that are apparent to the physician. In this case, the identification of the assailant was reasonably necessary to the victim's medical diagnosis and treatment. Indeed, the victim's identification of defendant was an inseparable part of the examination when she volunteered it as her first statement to [the physician]. [*Id*. at 96-97.]

As in *Duenaz*, the victim's statements to the SANE served several purposes. The SANE testified that she asked the victim a series of questions, for example to note "any follow-up care, or if any medications they're taking will have any interactions with any medications that we will be providing." The SANE also noted the importance of learning about any past injuries. And the SANE stated that she asked about the victim's history of sexual abuse because it was important for "any safety planning." Thus, the SANE's objective was to assess the victim for injuries and make sure she was treated medically, but also ensure that the victim was safe when she left the facility. As in *Duenaz*, the statements were "reasonably necessary to the victim's diagnosis and treatment." *Id*. at 97 (quotation marks and citation omitted). See also *Mahone*, 294 Mich App at 215 ("Particularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment.").

And, even if the trial court had committed plain error by allowing the SANE to testify, defendant must still demonstrate that this alleged error was outcome-determinative. See *Duenaz*, 306 Mich App at 97; *Carines*, 460 Mich at 763. According to the SANE, the victim reported:

> "My mom was at work. I was in my room. He made me get off the game. He started touching on my breasts and my waist. Then he held me. He tried taking off my shorts. He did.
>
> He put his penis on my thigh. He was trying to put it in my vagina. Then he was holding onto me. He didn't finish. I pushed him off. He left out the room. He has been doing this since August 9th."

"[T]he admission of a hearsay statement that is cumulative to in-court testimony by the declarant can be harmless error, particularly when corroborated by other evidence." *Id*. (quotation marks and citation omitted; alteration in original). Moreover, the danger of prejudice is reduced when the "hearsay was cumulative" and when the "victim-declarant was subject to cross-examination at trial." *Id*. The SANE's recitation of the victim's accusation was merely cumulative

of the testimony that the jury heard from several witnesses about defendant's sexual assaults. The victim testified that on numerous occasions defendant groped her and touched her. She also stated that on at least three occasions, defendant attempted to put his penis inside of her vagina. In addition, the victim was subject to cross-examination during trial. Thus, defendant failed to demonstrate that the outcome of the case would have otherwise been different had the SANE not recited the victim's accusation. Accordingly, defendant is not entitled to relief on this claim.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that his trial counsel was ineffective for failing to object to the testimony from Sergeant MacRae and the SANE. We disagree.

> Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. The trial court must first find the facts and then decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel. The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. [*People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014) (quotation marks and citations omitted).]

To establish ineffective assistance of counsel, defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Zitka*, 335 Mich App 324, 341; 966 NW2d 786 (2020) (quotation marks and citation omitted). "The defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id.* (quotation marks and citation omitted).

Addressing Sergeant MacRae's testimony, as noted above, under *Lowrey*, it was not improper for Sergeant MacRae to describe defendant's demeanor during the interview as evasive. Police officers are permitted to testify about their perceptions of the defendant's behavior provided they do not opine on the defendant's ultimate guilt or innocence. *Lowrey*, 342 Mich App at 112. Thus, had defense counsel objected at the time the statement was made, it would have been unsuccessful as a meritless objection. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

Similarly, as detailed above, defendant cannot show that absent the statement made by Sergeant MacRae, there was a reasonable probability that the outcome of the trial would have been different. See *Trakhtenberg*, 493 Mich at 51. The jury heard testimony from the three witnesses who alleged that defendant sexually assaulted them, which was corroborated in certain aspects by other witness testimony. To prevail, defendant would need to show that absent Sergeant MacRae saying defendant was evasive during his interview, the jury would not have believed any of the witnesses who stated they were assaulted by defendant or witnessed defendant's inappropriate conduct. See *id.* Defendant has not overcome this burden and, therefore, is not entitled to a new trial.

Similarly, trial counsel was not ineffective for failing to object to the SANE's testimony. This Court has held on several occasions that statements from child victims during sexual assault examinations are admissible under MRE 803(4), see *Duenaz*, 306 Mich App at 94-97; *Mahone*, 294 Mich App at 214-215, and defendant has not provided this Court with any authority to the contrary. Thus, had defense counsel objected, it is likely the objection would have been overruled. See *Ericksen*, 288 Mich App at 201. Similarly, defendant has not demonstrated that absent defense counsel's purported error of failing to object, the outcome of his trial would have been different. See *Trakhtenberg*, 493 Mich at 51. As noted, the SANE's testimony about the victim's accusations was cumulative and the victim herself was subject to cross-examination. Had the jury not heard the SANE's testimony, it is still likely that defendant would have been convicted on the basis of the testimony from the other witnesses. Accordingly, defendant has not shown that absent the SANE's testimony, there was a reasonable probability that the outcome would have been different.

## VII. SENTENCING

Lastly, defendant contends that the trial court's failure to justify the within-guidelines 15-year minimum sentences for the CSC-I convictions hinders his ability to challenge the sentences. Nonetheless, he contends that the sentences were not proportionate given the fact that this was his first offense. We disagree.

"Sentencing decisions are reviewed for an abuse of discretion." *People v Boykin*, 510 Mich 171, 182; 987 NW2d 58 (2022). "A given sentence constitutes an abuse of discretion if that sentence violates the principle of proportionality." *People v Lydic*, 335 Mich App 486, 500; 967 NW2d 847 (2021) (quotation marks and citation omitted).

Sentences that are within the guidelines carry a "nonbinding rebuttable presumption of proportionality." *People v Posey*, 512 Mich 317, 360; 1 NW3d 101 (2023) (opinion by BOLDEN, J.). "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality . . . ." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017) (quotation marks and citation omitted). The principle of proportionality "requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 460 (quotation marks and citation omitted). In *People v Posey (On Remand)*, ___ Mich App ___; ___ NW3d ___ (2023) (Docket No. 345491); slip op at 2-3, this Court explained the standard for assessing the reasonableness of a sentence:

> An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense. With respect to sentencing and the guidelines, the key test is not whether a sentence departs from or adheres to the guidelines range. The key test is whether the sentence is proportionate to the

seriousness of the matter. In regard to proportionality, the *Milbourn*[7] Court observed that the Legislature has determined to visit the stiffest punishment against persons who have demonstrated an unwillingness to obey the law after prior encounters with the criminal justice system. The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment. [Quotation marks and citations omitted.]

"[T]he defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate." *Id*. at ___; slip op at 2.

First, defendant contends that the trial court failed to justify the sentence imposed. Before the sentencing, the prosecutor noted that the victim, the victim's grandmother, FW, and AM were present in the courtroom. These individuals opted not to make a statement on the record. The victim requested the trial court read the letter that she had submitted. And, the victim's grandmother asked the trial court to consider the statement that she made in the presentence investigation report.

The prosecutor advocated for a sentence at the higher end of the sentencing guidelines. To support that request, the prosecutor noted that the extraction of defendant's phone was troubling. She opined that it demonstrated that defendant was obsessed with the victim because he had thousands of photographs of the victim on his phone, had less than 10 photographs of his wife, and had additional images that could only be construed as pornography.

In contrast, defense counsel disputed whether the images constituted pornography and noted that the sentencing did not involve a pornography charge. Further, he argued that it was evident that the victim's mother had mental health issues, and the family was trying to raise the victim and LC as best as they could. Defense counsel noted the strong family support for defendant, asserted that he was a family man, and cited his efforts to financially provide for his family. When imposing the sentences, the trial court stated:

> I sat through this trial and I am going to tell you that as the trial progressed and I watched [the victim] testify - - and honestly it was very apparent to me that she was quite traumatized - - she was having a hard time hardly dealing with the questions and remembering and she kind of was just so frazzled. And to be honest, um, she was so traumatized and that's the problem that you have with these kinds of cases. Because it becomes her word against his word and sometimes - - because what defense does is say, well, your story doesn't sound the same but, you know, she said this began when she was eight, I think, and continued until she was fourteen, fifteen - - fifteen.

---

[7] *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), abrogated in part on other grounds as recognized by *Steanhouse*, 500 Mich at 477.

-14-

And an eight-year-old, I don't even know if an eight-year-old can conceive what was happening to her.

But, of course, the defense has a job, and many times the defense is much more - - and they are - - not many times, they are. They're going to be more skilled at this than this child who would have to testify in front of these people about some sexual issues that happened to her.

These cases are probably the worst for me to listen to.

And I wasn't sure how the jury was going to take it because she was so shaken.

But let me tell you when [FW] and [the victim – sic[8]] took the stand, who weren't - - did not go through that for years, and I listened to them and how straightforward they were and unshakeable about what happened to them, it became very clear to me that this happened.

[FW] to the point of their mothers were friends - - and this is a lesson in which I always - - and this is a lesson about letting your kids spend the night places - - places that you think are safe - - which is why I don't let my kids go very many places at all. Because you think it is your best friend and you assume the house is safe.

And her testimony was I was so distraught about going over there and, you know, and I told my mom that, and because my mom didn't listen she began to actually basically be torturous or mean to [the victim]. And what does that say? And then [the victim] said she called her later and apologized because she doesn't even tell her why she's treating her in that way. Because she does not want to go there anymore.

So as a child, I have to think if I'm talking to my parent and my patient [sic] is not listening, and then as a child I've got to figure out what do I have to do, because I'm not in control of my life, to not go to this place.

So she has to ruin her relationship with a friend, to really completely act out of being mean and physical with this young lady so that they will say that they're not good at being friends. So she has to destroy a relationship to not go to this house, which I found quite believable as a child. Because what else can you do if they keep telling you, you've got to go?

I ask my child all the time - - every time she comes back from any place, was there anything that happened to you?

---

[8] In context, it appears that the trial court meant to identify AM.

If my child says I don't want to go somewhere, immediately, you don't go. And sometimes I just don't let her go.

And then [AM], who had been friends with her since middle school, who said after the situation happened to her - - and I listened to the way the question was asked, and you continued to go over there, and she said absolutely not. I went over there to change a hoodie and I didn't even go in the house because we would share hoodies, which my daughter also does with her friends.

So I wanted to see, if this really happened, she's not going back to that house. And she testified, I didn't go back. I went there but I didn't go in and I never stayed the night again.

And these are two young ladies who don't know each other. So this is not the same friend group.

That was the other thing I listened for.

She was asked, both [AM] and [FW] about knowing each other. They don't know each other. They're not at the same school. Neither one would have known anything about what was happening with [defendant]. And neither one testified that [the victim] ever told them anything about what was happening with [defendant].

As a matter of fact, [the victim] tried to protect him and say that, well, possibly [FW] or [AM] was telling a story because this was her dad and he wouldn't do that.

So none of these girls ever talked to each other about what happened but yet they all have the same story, in the same home, with the same person.

So I don't believe for a second that it didn't happen. I believe that the jury got it right.

I believe that the other thing that was troubling to me is this defense of, well, she kept getting in trouble about her boyfriend so this is the reason she would make this up. Although, there was no indication that [defendant] was the main person keeping her from her boyfriend. There was no testimony about that. It seemed to be the mom more so.

But here's the interesting thing. So her phone was taken and she couldn't hang out or whatever with her boyfriend. What did that have to do with her grandma who is her biological grandma? And yet the grandma was not allowed to see her and was told because she's on punishment or she's - - who doesn't let their daughter see their grandmother because they're on punishment? Friends I can see, going to the movies, hanging out.

I don't believe for a second that they didn't let her see her grandmother because she was on punishment. They didn't want her to see her grandmother because the grandmother is keyed into what is happening. Something is not right at that house and they didn't want the grandmother to know or to be involved.

Where does she end up? At the grandmother's house who finally does believe her.

And then the boyfriend's mother is the one that takes her. And the boyfriend's mother has no idea about her staying the night at the house. The testimony about they think she was running to the house all the time. She was - - I don't know her to stay at my house.

So, you know, it was - - it was quite believable. I don't have any doubt that this took place. I think he groomed her. I think he was nice to her, I think he bought her things, and I think she got to the point where she actually thought she was in a relationship with him. I really do. Because what happens is those kind of girls, they start to think they are special to that person and so the thought of them doing something to somebody else, then it becomes troubling and that will make them upset because I thought I was special because you groomed me to the point of me thinking that I'm special.

*   *   *

So with respect to the guidelines, the guidelines with respect to the first three counts, which is the criminal sexual conduct first-degree relationship - - and the reason that this is a life offense - - which it is - - is because you take advantage of a position you have in a relationship because you have access. You are right there in the home. Mom is not always around.

For the life of me, I can't understand why any stepfather would need to be on the phone constantly texting his daughter anyway. That was also another telltale point, to me.

Actually, any discussions you are having you can have with your wife about your daughter. I don't know why you would have to be directly contacting your daughter all through school and during the day and things of that nature. I don't believe for a second this didn't happen. I believe the jury got it right.

The Court is going to sentence [defendant] to 15 to 40 years on Counts One, Two, and Three.

And as to the other counts where the guidelines are 3 to 6 years, the Court is going to sentence him 5 to 15 [years] to run concurrent with the other three.

Contrary to defendant's assertion, the trial court set forth its justification for imposing the 15-to-40-year sentences for the three CSC-I counts, and the concurrent 5-to-15-year sentences for the two CSC-II counts. Specifically, the trial court noted that the clarity of the victim's testimony

was impacted by the trauma of sexual abuse beginning at a young age. However, the trial court found that the similarity in the manner that defendant groomed and abused FW and AM demonstrated the validity of the jury verdict. Further, defendant manipulated the victim into denying the sexual assaults. When AM disclosed the sexual abuse by defendant, the victim denied her own sexual abuse by defendant or that defendant would abuse her friend. And, when the victim's other relationships potentially threatened defendant's control of the victim, he took steps to interfere. After the victim's grandmother alerted the victim's mother about defendant's questionable statements, the grandmother's contact with the victim was essentially cut off. And, after the victim became involved with a boyfriend, the victim's parents claimed that she began lying and sneaking out, warranting punishment. Although defendant denied the sexual abuse, LC, his son, acknowledged playing "hide and seek" and "spin the bottle" and witnessing defendant laying with the victim in a state of undress. Thus, in imposing the sentences, the trial court considered the seriousness of the offenses, the sexual abuse of a child for nearly six years, and the offender, a stepfather who manipulated the relationship he had with the victim and attempted to isolate the victim from others to prevent the disclosure of his sexual assaults. *Steanhouse*, 500 Mich at 460.

Although defendant acknowledges that his 180-month minimum sentences are within the guidelines range of 126 to 210 months, he contends that he has overcome the presumed proportionality of the within-guidelines sentence. Specifically, defendant cites to his lack of a prior record before being sentenced in this case and his age, 42 years old. He does not address in any meaningful way, however, his culpability in sexually assaulting his stepdaughter and her friends over a period of six years. In other words, while defendant attempts to highlight the mitigating factors that he asserts the trial court should have considered, he makes no attempt to balance that against the gravity of his offenses.

It is defendant's burden to show that his sentence was not proportional and he has not carried that burden in his submission to this Court. *Posey (On Remand)*, ___ Mich App ___; slip op at 2-3. Defendant was required to rebut the presumption that his sentence was proportional by "present[ing] unusual circumstances that would render the presumptively proportionate sentence disproportionate." *Bowling*, 299 Mich App at 558 (quotation marks and citation omitted). The bare fact that defendant was not convicted of any other crimes before he was convicted of three counts of CSC-I, each of which carried a potential life sentence, MCL 750.520b(2)(b), is not so "unusual" as to render his sentence disproportionate.

While it is true that the present offenses appear to be defendant's first criminal convictions, the crimes for which he was convicted are serious crimes as evidenced by the period of incarceration that could result. For CSC-I, defendant faced a life sentence. MCL 750.520b(2)(a). The evidence presented at trial demonstrated that defendant groomed and preyed on young girls around him.

At trial, defendant attempted to portray the victim as an unruly teenager who was just acting out for attention. During sentencing, defendant never accepted responsibility for his crimes or demonstrated that he understood that he caused the victim and her friends serious emotional and physical harm. "The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *Posey (On Remand)*, ___ Mich App at ___; slip op at 3. While defendant's record did not reflect

he was a recidivist criminal, the crimes for which he was convicted are some of the most egregious in the state, and the trial court's 15 to 40 years prison sentence was not disproportionate or unreasonable for his CSC-I convictions.

Affirmed.

/s/ Adrienne N. Young
/s/ Anica Letica
/s/ Daniel S. Korobkin